IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

HERMAN SUTTON III,

    Plaintiff,

vs.                                            CASE NO. 1:13-cv-163-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

    Defendant.

_____/

**REPORT AND RECOMMENDATION**

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for supplemental security income (SSI).  Doc. 1.  The Commissioner has answered, Doc. 9, and both parties have filed briefs outlining their respective positions.  Docs. 14, 16.  For the reasons discussed below, the undersigned recommends that the Commissioner's decision should be affirmed.

**I.  PROCEDURAL HISTORY**

Plaintiff applied for SSI on July 30, 2010, alleging disability since April 10, 2010.[1]  (R. 129-132.)   His application was denied initially and upon reconsideration.  (R. 64-65; 69-72; 76-78.)  A hearing was held before an Administrative Law Judge (ALJ) on March 9, 2012.  At the hearing Plaintiff and a vocational expert (VE) testified.  (R. 29-55.)  The ALJ denied Plaintiff's claims in a decision dated May 16, 2012, finding that although

---

[1] Plaintiff also applied for Disability Insurance Benefits, but did not qualify for them because he had not worked long enough.  (R. 66-68.)

Plaintiff suffered from the severe impairments of degenerative disc disease, high blood pressure, diabetes mellitus, and obesity, he was not disabled. (R. 17-24.) The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the Commissioner's final decision. (R. 1-4.) On August 23, 2013, Plaintiff filed the instant appeal to this Court. Doc. 1. On appeal, Plaintiff raises two issues: (1) whether the ALJ erred in assessing the effects of Plaintiff's obesity; and (2) whether substantial evidence supports the ALJ's determination that Plaintiff has no severe mental impairments. Doc. 14.

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[2] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4] The district court must view the evidence as a whole,

---

[2] *See* 42 U.S.C. § 405(g) (2000).

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

taking into account evidence favorable as well as unfavorable to the decision.[5]
However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[6]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[8]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[9] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[10] The Commissioner may satisfy this burden

---

[5] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[6] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[10] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

   In practice, the burden temporarily shifts at step five to the Commissioner. The

by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[11]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[12] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[13]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[14] Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[15] Only after the Commissioner meets this burden

---

Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[11] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[12] Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[13] Walker, 826 F.2d at 1003.

[14] Wolfe, 86 F.3d at 1077-78.

[15] *See id.*

does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III.  SUMMARY OF THE RECORD

#### A. Medical Record Evidence

Because Plaintiff's appeal focuses on his obesity and his mental health impairments, the Court's summary of his medical records will focus on these issues.

Plaintiff's medical records from his mental health treatment at Shands at Vista are from 2006, before the alleged onset date.  However, those records reflect that Plaintiff complained of depression and was prescribed Wellbutrin.  (R. 217-31.)

In April 2010 Plaintiff presented to North Florida Regional Medical Center Emergency Room with complaints of back pain and radiculpathy following a fall at work. A CT scan revealed advanced degenerative disc change with at least moderate degree of spinal stenosis at L4/L5, L5/S1, and L3/L4. There also was bilateral recess stenosis at L4-5, and bilateral osseous neural narrowing at L5/S1 and L4/L5.  There was mild spinal stenosis at L2/L3 and even less at L1/L2.  There was no fracture.  (R. 239-43.)

Plaintiff treated with Dr. Barry Kaplan from June to October 2010.  Dr. Kaplan found decreased range of motion of Plaintiff's back in extension, and a -2 dorsiflexion weakness of the right. Dr. Kaplan also noted significant spinal stenosis changes at L3-4, L4-5, with marked canal compromise.  He recommended that Plaintiff undergo physical therapy for his lumbar stenosis and have an MRI.  The MRI showed mild disc space narrowing at L1-L2; moderate at L3-L4; and moderate to sever at L4-5 and L5-S1.  The axial study at L1-L2 showed mild annular bugling and facet hypertrophy, but

no high-grade canal or foraminal stenosis or focal disc protrusion.  Dr. Kaplan opined that although Plaintiff's spinal stenosis pre-dated his work-related injury, his fall at work caused a nerve root contusion which worsened his symptoms.  In July 2010, Dr. Kaplan noted that Plaintiff had requested pain injections, which Dr. Kaplan believed was a reasonable course of treatment rather than surgical injections.  Dr. Kaplan stated that the injections might not be successful, but thought it reasonable to try them.  Later, in October, Dr. Kaplan wrote that Plaintiff had failed conservative measures for pain relief, and that Plaintiff needed a two-level fusion including the L4-5 and S1 for his stenosis and disc disease.  (R. 313-329.)

    Plaintiff was evaluated by consultative examiner Dr. William Beaty, a licensed psychologist, on September 13, 2010.  Dr. Beaty noted that Plaintiff was well-groomed and dressed, but used a cane and had a limp. Dr. Beaty noted Plaintiff's history of substance abuse, and also his various stints in prison.  Dr. Beaty stated that although Plaintiff was obese, he had lost around forty pounds recently.  Plaintiff reported that he had been depressed fo a long time, but had stopped taking Wellbutrin because he could not afford it.  Dr. Beaty also recorded Plaintiff's reported activities of daily living, noting that Plaintiff could dress himself, prepare a microwave meal, and could accompany his girlfriend to buy groceries. Dr. Beaty described Plaintiff as pleasant, cooperative, responsive, with good eye contact, and able to hear and understand conversational speech.  Dr. Beaty concluded that Plaintiff appeared to be depressed related to his job loss and accident at work.  (R. 286-88.)  On March 8, 2012, more than a year after Dr. Beaty examined Plaintiff, he completed a check box mental RFC

evaluation of Plaintiff. The mental RFC assessment form was provided to him by Plaintiff's counsel.  (R. 353-355.)

On October 13, 2010, state agency physician Michael Zelenka, Ph.D., opined that Plaintiff was suffering from major depressive disorder, moderate. He opined that Plaintiff had mild limitations in his activities of daily living, maintaining social functioning, maintaining concentration, persistence, or pace, and no episodes of decompensation. (R. 295-308.)

Plaintiff also treated with Dr. Efrain Rosario-Carlo, a family physician, from 2009 through January of 2011.  Plaintiff was diagnosed with diabetes mellitus, obesity, and back pain/lumbago.  (R. 330-338.)

Plaintiff returned to  to North Florida Regional Medical Center Emergency Room on December 15, 2010, with complaints of chest pain.  The physician noted that Plaintiff's EKG was abnormal, but his pain had resolved.  Plaintiff was admitted overnight for monitoring and placed on a cardiac diet.  (R. 265-285.)

Plaintiff presented to Shands at the University of Florida Hospital Emergency Room with complaints that the left side of his face was tingling.  After reviewing his medical history, evaluating Plaintiff and performing tests, the physician noted that Plaintiff was under a lot of stress because his sister was just put into hospice.  Plaintiff was advised to return to his primary care provider for treatment to control his blood pressure.  The record reflects that Plaintiff could ambulate with a steady gate.  (R. 392-411.)

### B. Hearing Testimony

Plaintiff testified that he was fifty years old at the time of the hearing, and had completed high school. He lived with his fiancé, and although he has four children he did not live with them. Plaintiff did not have a driver's license because he had failed to pay fines. A friend dropped him off at his hearing. (R. 33-34.)

The ALJ noted that Plaintiff had an earnings history from 2007-2010, but not for any other years within the past fifteen years. Plaintiff explained that in 1997-1998 he worked in lawn service, and from about 2000-2003 Plaintiff owned a pawn and jewelry business. There were no reported earnings from either of these positions because Plaintiff did not file taxes. After working at a pawn shop, Plaintiff worked for his fiancé's cleaning service for about a year between 2003 and 2007, but that was his only work during that time. There were also reported earnings from his time as an assistant manager and short-order cook at Sonny's Barbeque beginning in 2007. Plaintiff testified that he left his job at Sonny's after he hurt himself at work, when he slipped in the cooker room in the back where the floor was frequently greasy. (R. 34-38.)

Plaintiff stated that he had not worked since July of 2010, and had not applied for any jobs. However, he testified that he had received unemployment. When the ALJ asked Plaintiff why he applied for unemployment, Plaintiff responded "[b]ecuse I'm not able to work, sir." After the ALJ pointed out this inconsistency, Plaintiff stated that once he lost his job he was instructed to seek unemployment, and he had in fact applied for work since July of 2010 at the "one-stop center." (R. 40-42.)

Plaintiff testified that he felt he could no longer work because his previous work

had involved being on his feet the whole day, and now he could only stand for twenty or thirty minutes at one time. He stated that he could lift a gallon of milk and other household items, could sit for about forty-five minutes, and could walk for about two blocks. (R. 42-43.)

He testified that he was taking pain medications which helped him sometimes, but was not undergoing physical therapy. Plaintiff later clarified that he underwent physical therapy in 2010 when he was covered by worker's compensation. (R. 43-44.)

Plaintiff stated that he had received pain injections within the past couple of years, and was currently being treated by Dr. Rosario. He was using a cane to ambulate, which Dr. Rosario suggested. (R. 44-45.) Plaintiff clarified that the pain injections were recommended by his doctor, and he had pain in his back every day. He said his pain was a seven out of ten and was concentrated in his lower back. (R. 48-49.)

Plaintiff advised that he had treatment for depression at Vista in 2006, but had not been back there since. (R. 46, 48.) Plaintiff recalled seeing Dr. Beatty for a mental health consultative examination, and agreed that he was suffering from some depression. (R. 50.)

Plaintiff said that his fiancé worked, and so he was home by himself most of the day. He stated that he did some of the cooking, they shared the laundry, and she did the housework. He testified that he attended church about once a month. (R. 47-48.)

A vocational expert (VE) also testified at the hearing. The VE testified that Plaintiff had past relevant work as a food service manager, which has an exertion level

of light, with an SVP of 7, so it was a skilled position. Plaintiff also had experience as a pawn broker, which has an exertion level of light, with an SVP of 6, and therefore this job also was a skilled position. The ALJ posed a hypothetical question to the VE, in which he asked the VE to assume an individual the same age as Plaintiff, with the same educational background and past work experience, who was capable of light work with the restrictions that he could only occasionally climb, balance, stoop, kneel, crouch, and crawl, and should avoid concentrated exposure to concentrated vibration, as well as hazards such as machinery and heights. The VE testified that such an individual could perform Plaintiff's past relevant work as a food service manager and pawn broker. (R. 51-54.)

### C. ALJ's Decision

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since July 30, 2010, his alleged onset date. He determined that Plaintiff had the severe impairments of: degenerative disc disease, high blood pressure, diabetes mellitus, and obesity. However, he found that Plaintiff's medically determinable mental impairment of depression does not cause more than minimal limitation in his ability to perform basic mental work activities and is therefore non-severe. He further found that Plaintiff did not have an impairment or combination of impairments that met or equaled the Listings. (R. 17-20.)

The ALJ determined that Plaintiff had the RFC to perform light work as defined in 20 CFR 416.967(b), except that he was limited to only occasional climbing, balancing, stooping, kneeling, crouching, and crawling, but should avoid exposure to concentrated

vibration and hazards such as heights and machinery. In making this determination, the ALJ partially credited Plaintiff's complaints regarding the effects of his medically determinable impairments, but found that Plaintiff's complaints were not fully credible. The ALJ reviewed the records of Dr. Kaplan and gave them "little" weight, because the work certificate was conclusory and did not indicate at least twelve months of disability. The ALJ also noted that Plaintiff had not been seen by Dr. Kaplan since October of 2010 and had not received any ongoing treatment for his back pain. The ALJ also discussed Plaintiff's poor work history and his acceptance of unemployment benefits in 2010 and 2011. The ALJ accorded "some" weight to the state agency evaluators' RFC assessments, noting there were also other reasons to reach the conclusion that they had. (R. 20-24.)

The ALJ concluded that Plaintiff was capable of performing his past relevant work, and accordingly concluded that Plaintiff was not disabled. (R. 24.)

## IV. DISCUSSION

### A. The ALJ Properly Considered Plaintiff's Obesity In Evaluating Plaintiff's RFC and Determining Whether Plaintiff Met a Listing

Plaintiff contends that the ALJ failed to properly follow Social Security Ruling 02-1p in finding that Plaintiff is not disabled. Social Security Ruling 02-1p guides the evaluation of obesity in disability claims, and was published following the deletion of Listing 9.09, Obesity, from the Listing of Impairments. *See* 67 Fed. Reg. 57859, 57860-61 (Sept. 12, 2002). The SSR recognizes that obesity is a risk factor that increases the chance of developing impairments in other body systems, including the cardiovascular,

respiratory, and musculoskeletal body systems. *Id*. The SSR provides that the ALJ should consider the effect of obesity at each step of the sequential evaluation:

> [T]he combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately.... [A]djudicators [should] consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity.

*Id*. at 57861-62.

Plaintiff says that the ALJ failed to "realistically evaluate the increased back pain that would be concomitant with Plaintiff Sutton' (sic) morbid obesity" in determining Plaintiff's RFC at Step Four, thus, requiring that this case should be remanded with directions to the Commissioner to instruct the ALJ to follow Social Security Ruling 02-1p. Doc. 14. The Commissioner points out that Plaintiff did not allege during his hearing that his obesity contributed to his physical limitations, and that there is no medical evidence attributing any additional functional limitations due to Plaintiff's obesity other than those already considered by the ALJ in formulating his RFC. Doc. 16.

The ALJ found that Plaintiff's obesity was a severe impairment at step two of the sequential analysis. The ALJ also discussed Plaintiff's medical records in detail, including discussing Plaintiff's back pain, his degenerative disc disease and his functional limitations therefrom. Plaintiff's medical records, referred to by the ALJ, highlight Plaintiff's weight and obesity, and its impact on Plaintiff's health. Thus, the ALJ's RFC determination accounted for Plaintiff's obesity and other impairments by

limiting Plaintiff to light work with additional limitations. (R. 21-24.)

Notably absent from the medical evidence are any medical records attributing any functional limitations due to Plaintiff's obesity. No doctor – including Dr. Kaplan – placed any limitations on Plaintiff due to his obesity. Thus, Plaintiff has not pointed to any evidence suggesting particular additional limitations from obesity that the ALJ failed to consider. *See, Vickers v Astrue*, 2009 WL 722273, at *14 (N.D. Fla. Mar. 18, 2009)(remand for failure to mention obesity was not required where the claimant did not show how his obesity impacted his ability to work.)

Even though no doctor placed any restrictions on Plaintiff as a consequence of his obesity, Dr. Krishnamurthy, one of the state agency non-examining physicians, considered Plaintiff's height and weight in finding that Plaintiff could perform a limited range of light work. The ALJ expressly referred to and relied upon this opinion in his written decision and thus there is no question that the ALJ took Plaintiff's obesity into account in evaluation Plaintiff's RFC.

Lastly, the ALJ considered Plaintiff's obesity in determining that Plaintiff did not meet listing 1.04A relating to spinal disorders. According to Plaintiff, the ALJ did not take into account Plaintiff's height, weight and BMI in combination with Plaintiff's lumbar spinal stenosis in determining whether Plaintiff met listing 1.04A. There is, however, no evidence in the record explaining how Plaintiff's height, weight and BMI in combination with Plaintiff's other back problems met listing 1.04A. Indeed, the ALJ expressly found in his written decision that Plaintiff did not meet listing 1.04A because there was no evidence that Plaintiff had satisfied the requirement that a claimant must have a

positive straight leg raise test in order to meet the listing.

Accordingly, the Court concludes that the ALJ fully and properly considered Plaintiff's obesity, and the functional limitations arising therefrom, in combination with Plaintiff's other impairments in evaluating his RFC. As such, Plaintiff's argument that the ALJ erred by failing to address Plaintiff's obesity as required by the Social Security Ruling has no merit.

### B.  The ALJ Did Not Err In Concluding that Plaintiff Did Not Have A Severe Mental Impairment

Plaintiff contends that substantial evidence does not support the ALJ's finding that Plaintiff's depression was not a severe impairment at Step Two and, accordingly, that the ALJ failed to consider Plaintiff's depression in combination with his other severe impairments. Doc. 21.

An impairment or combination of impairments is severe at Step Two of the sequential evaluation if it significantly limits one's physical or mental ability to do basic work activities.[16] To be considered "severe" a medical condition must constitute more than a "deviation from purely medical standards of bodily perfection or normality."[17] Thus, a diagnosis of a mental impairment does not necessarily compel the conclusion that the condition is disabling.[18] Although the threshold for meeting the definition of a "severe impairment" at Step Two is low, the burden is, nonetheless, on the Plaintiff to

---

[16] 20 C.F.R. § 404.1520(c).

[17] McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

[18] 20 C.F.R. §§ 404.1520(c), 416.920(c); see also Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("[t]here must be a showing of related functional loss" for a psychological disorder to be considered disabling).

provide evidence demonstrating the disabling impact of the mental impairments.[19] The ALJ is required to evaluate Plaintiff's mental impairments in four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.[20] If the degree of limitation in the first three functional areas is rated as "none" or "mild" and "none" in the fourth area, the ALJ generally concludes the mental impairment is not severe.[21]

Here, the ALJ specifically found that the medical evidence failed to show any severe mental impairment. The ALJ stated that he considered the four broad functional areas, and found that Plaintiff had only mild restrictions in his activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. The ALJ appropriately pointed out and relied upon the fact that the Plaintiff had not received any mental health treatment since 2006, which was four years before the relevant period of time. Plaintiff did not attend counseling or receive therapy and was not taking any anti-depressant medications.

Plaintiff makes no persuasive argument to the contrary. Plaintiff contends that he did not receive treatment with a mental health professional and did not take anti-depressant medications because he was jobless and could not afford it. However, the treatment notes from 2009 through January 2011 by Dr. Rosario-Carlo, plaintiff's

---

[19] Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[20] 20 C.F.R. § 404.1520a(c)(3).

[21] 20 C.F.R. § 404.1520a(d)(1). See also Cuthbert v. Astrue, 303 F. App'x 697, 699 (11th Cir. 2008) (per curiam).

treating physician, do not contain any diagnosis of depression, do not contain any reports by Plaintiff of symptoms of depression and do not contain any mention that Plaintiff was prescribed Wellburtin or any other anti-depressant medications. And despite the fact that Plaintiff suggests the reason he did not seek mental health treatment or take medications was because he did not have insurance, the record reflects that he had Medicaid, and despite not having insurance, continued to seek treatment for his physical impairments.

Plaintiff also points to the mental RFC, prepared by Dr. Beaty, the one time examiner, as evidence that he had a severe mental impairment. The ALJ, however, specifically discounted Dr. Beaty's opinion and gave it "little weight" noting that Dr. Beaty's mental RFC on the check list form provided by Plaintiff's counsel, was completed more than a year after Dr. Beaty actually examined Plaintiff and imposed limitations well in excess of the findings in Dr. Beaty's initial examination, without providing any explanation for the discrepancy.

Plaintiff's conclusional assertion that the ALJ erred is insufficient to carry the relatively low burden of establishing the existence of a severe mental impairment. The ALJ considered and discussed all of the relevant evidence in determining that Plaintiff did not have a severe mental impairment, and the ALJ's conclusion that Plaintiff's mental impairment was not severe is supported by substantial evidence, as summarized above.

## V. RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of

the Commissioner should be **AFFIRMED**.

      **IN CHAMBERS,** in Gainesville, Florida, on the 11th day of August 2014.

                                *s/ Gary R. Jones*
                                GARY R. JONES
                                United States Magistrate Judge

### NOTICE TO THE PARTIES

      **Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**